OPINION
{¶ 1} Defendant-appellant, Miami University, appeals the decision of the Butler County Court of Common Pleas allowing plaintiff-appellee, Gloria Bales, to participate in the workers' compensation fund for bilateral shoulder strain and impingement syndrome of the right and left shoulders. *Page 2 
 {¶ 2} Bales has worked for the university since 1991 in various positions. In 2004, she was working as a custodial supervisor at the university recreational sports center ("Rec Center"). Each spring, the Rec Center is closed to everyone (shut-down) for a thorough cleaning which includes stripping and re-waxing the floors. In 2004, the shut-down and cleaning occurred during the week of May 10th. Bales worked 11 straight days from May 10 through May 20, 2004, stripping and re-waxing the floor of the Rec Center's lobby. During that period of time, Bales used a scrubbing machine as well as a wet vacuum ("wet vac") which she lifted and emptied into a sink "hundreds of times." After working about three days, Bales' shoulders started hurting to the extent she could not sleep at night. Bales did not seek medical attention right away because she had to get the work done during the shut-down. Despite the pain, Bales also continued to work as they were not allowed to miss work during the shut-down. Bales worked through the pain, took aspirin, and propped her hands up at night.
 {¶ 3} When the pain in her shoulders did not subside, Bales first sought medical treatment from a chiropractor. She was subsequently treated by her family physician, Rajesh Khanna, M.D., had an MRI of her right shoulder in July 2004 and her left shoulder in August 2004, and received a cortisone shot from another physician. When the pain continued despite those treatments, Bales went to see Stephen Autry, M. D., an orthopedic surgeon, who operated on her right shoulder in October 2004 and her left shoulder in March 2005.
 {¶ 4} Bales filed a workers' compensation claim which was allowed for "cervical strain, bi-lateral shoulder strain, and impingement syndrome, right shoulder and impingement syndrome, left shoulder." After exhausting all appeals to the Industrial Commission, the university filed an appeal in the trial court pursuant to R.C. 4123.512.
 {¶ 5} A bench trial was held on June 15, 2006. Bales testified on her behalf and submitted the transcribed deposition of Dr. Autry. The university presented the testimony of *Page 3 
four employees who were working under Bales' supervision during the May 2004 shut-down (David Pepper, Roger Day, Joy Tipton, and Roy Shelly), and submitted the transcribed deposition of Michael J. Rozen, M.D., an independent medical examiner. The testimony of Drs. Autry and Rozen will be fully discussed later. During the shut-down, David Pepper worked with Bales in the lobby of the Rec Center whereas Joy Tipton and Roy Shelly worked in a different part of the building. Asked whether he worked with Bales during the shut-down, Roger Day replied "I believe so." Day, Tipton, and Shelly all testified that they were contacted about the shut-down several weeks before the trial, and that they were not contacted in 2004. All four employees testified they did not observe Bales being injured or having trouble working during the shut-down; nor did they recall Bales complaining about being injured or having shoulder problems. Pepper also testified that most people drain the wet vac by unscrewing a plug on the vacuum and allowing the liquid to drain out, rather than emptying it into a sink. There was no testimony rebutting Bales' statement she drained the wet vac by lifting and emptying it into a sink rather than by unscrewing a plug.
 {¶ 6} On July 27, 2006, the trial court granted judgment in favor of Bales allowing her to participate in the workers' compensation fund for bilateral shoulder strain and impingement syndrome of the right and left shoulders, as follows:
 {¶ 7} "After a careful analysis of the evidence, the law and testimony of the witnesses, the Court believes that the claimant has suffered an industrial injury which the Court will recognize as a bi-lateral shoulder strain and impingement syndrome of both the right and left shoulders. The Court specifically disallows a cervical strain injury.
 {¶ 8} "* * *
 {¶ 9} "There was some evidence that in 1999 approximately five years prior to this accident, that the claimant did seek medical attention for shoulder problems. However, the Court has carefully reviewed the medical records presented to it and essentially the claimant *Page 4 
was a-symptomatic for a period of five years before the industrial injury. The claimant was asked to work twelve consecutive days doing very heavy, difficult physical labor which included operating a stripping machine on a hard surface. All parties agreed that this was difficult work and based upon the description of the work and the type of injury the claimant suffered, the Court believes the greater weight of the evidence supports the type of injury that the claimant sustained with the one that would be a direct result of her doing this type of industrial work. This is supported by the history she gave to her physicians and the opinion of her treating physician, Dr. Stephen Autry. The Court therefore allows the industrial injury as previously stated and denies the appeal of Miami University." The trial court's decision indicates that the trial court reviewed the testimony of Bales, Drs. Autry and Rozen, and Bales' fellow employees, Bales' numerous medical records, the parties' other joint exhibits, and Dr. Rozen's report.
 {¶ 10} The university appeals, raising the following assignment of error:
 {¶ 11} "THE TRIAL COURT ERRED IN GRANTING JUDGMENT IN FAVOR OF APPELLEE, GLORIA BALES."
 {¶ 12} The university first argues that the trial court erred by allowing Bales to participate in the workers' compensation fund for bilateral shoulder strain. The university argues there is no evidence at all in the record to support the trial court's conclusion that Bales suffers from bilateral shoulder strain. Bales concedes, and a review of the record shows, that Bales was never diagnosed with bilateral shoulder strain following the May 2004 shut-down. The trial court, therefore, erred by finding that Bales suffers from bilateral shoulder strain; its decision allowing Bales to participate in the workers' compensation fund for bilateral shoulder strain is accordingly reversed.
 {¶ 13} The university also argues that the trial court erred by allowing Bales to participate in the workers' compensation fund for impingement syndrome of the right and left *Page 5 
shoulders. Specifically, the university argues that the trial court's decision is against the manifest weight of the evidence because there is no evidence that Bales either suffered a work injury in May 2004 or that her employment during the May 2004 shut-down aggravated some physical condition. The university challenges the trial court's reliance on "incompetent" evidence, to wit, Bales' self-serving, uncorroborated testimony and Dr. Autry's testimony which was based on inaccurate medical and work histories, and the trial court's failure to consider "an abundance of uncontroverted" evidence, to wit, the testimony of Dr. Rozen and Bales' fellow employees.
 {¶ 14} To be entitled to workers' compensation benefits, an employee must prove by a preponderance of the evidence that his injury arose out of and in the course of his employment, and that a direct or proximate causal relationship existed between his injury and his harm or disability. Fox v. Indus. Comm. of Ohio (1955), 162 Ohio St. 569, 576. Where medical evidence is necessary, that evidence must show that the accidental injury was or probably was a direct or proximate cause of the harm or disability. Id. An injury can be sudden or develop gradually over time as the result of the performance of the injured worker's job-related duties. Village v. General Motors Corp. (1984),15 Ohio St.3d 129, 133.
 {¶ 15} A reviewing court will not reverse a judgment as being against the manifest weight of the evidence when there exists competent, credible evidence supporting the trial court's findings of fact and conclusions of law. See C.E. Morris Co. v. Foley Construction Co.
(1978), 54 Ohio St.2d 279; Seasons Coal Co. v. Cleveland (1984),10 Ohio St.3d 77. The weight to be given the evidence presented and the credibility of the witnesses are primarily matters for the trier of fact. Gordon Constr, Inc. v. Peterbilt of Cincinnati, Inc., Clermont App. No. CA2002-11-094, 2003-Ohio-5111, ¶ 30. This deferential review is premised upon the fact that the trier of fact is best able to view the witnesses, observe their demeanor, gestures, and voices inflections, and ultimately, assess and evaluate their credibility. Seasons Coal; Fordv. *Page 6 Van Stop, Inc. (Dec. 30, 1998), Butler App. No. CA98-03-064.
 {¶ 16} A reviewing court must indulge every reasonable presumption in favor of the trial court's judgment and findings of fact. Gerijo, Inc.v. Fairfield, 70 Ohio St.3d 223, 226, 1994-Ohio-432. In the event the evidence is susceptible to more than one interpretation, the reviewing court must construe it consistently with the trial court's judgment. Id. In reviewing a bench trial, an appellate court will uphold the trial court's decision unless it appears the record cannot support a reasonable person in concluding as the trial judge did. Harris v. CustomGraphics, Inc., Cuyahoga App. No. 84326, 2005-Ohio-285, ¶ 8.
 {¶ 17} As stated earlier, Bales' shoulder problems started three days into the shutdown. Bales nonetheless worked through the shut-down. She continued to work until July 12, 2004, all the while taking considerable pain medicine. Bales first sought medical treatment from Thaddeus Rauch, D.C., a chiropractor. She first saw him on May 28, 2004, complaining of shoulder and knee pain. In a case history form she completed for Dr. Rauch, Bales indicated, in the order of importance, that she had had shoulder problem for a month and one-half and knee problem for three months. Bales further indicated that her condition was not related to an accident. At trial, Bales explained that she understood the term accident to mean "fall down, getting knocked down, run over," and that in any event, she told Dr. Rauch "it happened at work." Asked why Dr. Rauch's medical records at first only refer to her right shoulder rather than both, Bales testified she told him that her right shoulder "was hurting worse. Let's fix this one." Bales was surprised to learn Dr. Rauch's medical records did not mention her left shoulder until June 30, 2004. Bales continued her treatment with Dr. Rauch for a few months. Ultimately, Bales received no improvement in her shoulders from the chiropractic treatment.
 {¶ 18} Next, Bales sought treatment from her family physician, Dr. Khanna. She first saw Dr. Minnie Pathrose-Peterson in the office on July 27, 2004. Dr. Pathrose-Peterson's *Page 7 
notes for that day indicate in pertinent part: "The patient is here with severe pain involving both shoulders, right worse than left, and also severe neck pain. Apparently symptoms have been ongoing for the past 5 months. She does repetitive motions with both her hands, mopping the floors, predominantly left-handed. Has been seeing a chiropractor for a month. * * * The patient at this point does not think that she would claim this as a Workers Comp injury. Also, not sure about whether she wants to continue treatment with the chiropractor because that does not seem to be helping. * * * She can barely lift both shoulders to comb her hair or do things around the house. * * * Encouraged the patient to make some decisions regarding further treatment from the chiropractor/whether this is going to be Workers Comp, etc."
 {¶ 19} Bales did not remember telling Dr. Pathrose-Peterson that her shoulder problems had been going on for five months. Notes from previous 2004 visits to Dr. Khanna's office, including a visit a week before the shut-down, do not mention shoulder problems at all. Bales remembered telling Dr. Pathrose-Peterson that her shoulder problems "[were] from work." Bales subsequently had an MRI of her right shoulder on July 31, 2004 and of her left shoulder on August 9, 2004. She saw Dr. Khanna on August 6, 2004. Notes from that visit state in pertinent part: "[Patient] comes in at the current time distressed over neck and shoulder p[ai]n. She was actually seen for this pbm 1½ wks ago by Dr. Pathrose. She dates the pbm back actually long-standing. * * * She's having p[ai]n not only in her neck, C-spine as well as in her shoulders w/ restricted mobility of those joints. * * * At the current time states they're severe enough to the point that she's been unable to function. * * * Shoulder impingement syndrome testing of the upper extremities is positive." Bales ultimately went to see Dr. Autry who operated on her right shoulder in October 2004 and her left shoulder in March 2005.
 {¶ 20} Although she knew the university required ill or injured employees to fill out an *Page 8 
employee injury and illness report, Bales did not fill out her report until August 6, 2004, three months after the May 2004 shut-down. According to Bales, injured employees were required to fill out an accident report as soon as possible if they knew they had been injured. Bales explained she did not fill out the report until August because she thought her shoulder problems could be resolved. Further, it was not until August 2004 when she talked with the physician who gave her a cortisone shot as to what could be the cause of her problems that she knew it was related to the May 2004 shut-down.
 {¶ 21} Bales also testified that she had no shoulder problems in 2003 or before the May 2004 shut-down; she could not have told Dr. Autry about a car accident with a deer because she did not remember it until her memory was refreshed during her 2006 deposition; she did not tell Dr. Autry about her 1999 shoulder problems because she did not remember them; the medical treatment she received after the deer accident was more for her back and neck than her right shoulder; and she told every physician she saw after the May 2004 shutdown that "this happened at work." There is no evidence in the medical records before us that Bales received any shoulder treatment after 1999. It is not clear when the car accident with the deer occurred. The record before us provides two different years, 1994 and 1999.
 {¶ 22} Dr. Autry is an orthopedic surgeon who performs four to five shoulder surgeries per week and who operated on Bales' shoulders. Dr. Autry first saw Bales on September 8, 2004. In a letter he sent to Dr. Khanna a few days later, Dr. Autry stated that "[i]n May 2004 [Bales] developed bilateral shoulder pain, right greater than left. At this time her job required a significant amount of repetitive and overhead type activity. * * * At this time she complains of pain across the fronts of both shoulders that increase tremendously with any type of limited reaching or overhead activity. She has significant weakness in both sides with marked increased pain at night. Past medical history reveals no prior injury to either shoulder." During his deposition, Dr. Autry could not recall what the work-related repetitive overhead *Page 9 
activities were. Because Bales did not remember about her car accident with a deer or her 1999 shoulder problems until after she was treated by Dr. Autry, the medical history she provided to Dr. Autry did not include those two incidents. Dr. Autry's letter to Dr. Khanna indicates that Dr. Autry took x-rays of Bales' shoulders and that he reviewed the 2004 MRIs of Bales' shoulders.
 {¶ 23} Dr. Autry testified that upon examining her, he diagnosed Bales with impingement syndrome in both shoulders, and that the surgeries he performed on Bales' shoulders confirmed the diagnoses. Dr. Autry also testified that the x-rays of Bales' shoulders showed that she had a type III acromion in both shoulders. As a result, she had a pre-existing susceptibility to developing an impingement syndrome. Dr. Autry testified that impingement syndrome can develop overtime or have a sudden onset. Dr. Autry testified that based upon Bales' medical history (as provided by her), his examination of Bales in September 2004, and the surgeries he performed, the impingement syndrome in Bales' shoulders was caused or aggravated by her job duties during the May 2004 shut-down.
 {¶ 24} Dr. Rozen was a practicing orthopedic surgeon until a severe eye disease in 1996 forced him to stop performing surgeries. He is now an independent medical examiner and as such examined Bales on April 18, 2006, after her deposition. As reported in Dr. Rozen's report and deposition, Bales' past medical history includes a car accident with a deer and shoulder problems in 1999. The record shows that in late 1999, Bales started having pain in her right shoulder and right hip after helping her mother move. Dr. Khanna's records from November 1999 state: "Testing for shoulder impingement syndrome right side is positive. * * * Right shoulder x-rays, however, are unremarkable." There are no other references to shoulder problems in Bales' medical record between 1999 and 2004. According to Dr. Rozen, Bales reported the car accident with the deer but otherwise told him several times that she had had no other shoulder problems before the May 2004 shut-down. *Page 10 
 {¶ 25} Dr. Rozen testified that based upon Bales' medical history (as provided by her), her voluminous medical record, which included her medical records following the May 2004 shut-down as well as medical records dating back to 1995, his post-surgery examination of her, and the fact Bales was treated for acromial impingement syndrome in 1999, Bales' right and left shoulder problems were the result of "long-standing acromial impingement syndrome," arthritis in her acromioclavicular joint, and Bales' type III acromion. Dr. Rozen further testified that based upon Bales' work during the May 2004 shut-down, which was primarily in front of her and below her shoulder level, and not overhead, there was no causal or aggregative relationship between her acromial impingement syndrome and her job-related duties during the shut-down; nor was there evidence that an injury occurred during the shutdown. Simply, Bales' impingement syndrome was long-standing, most likely dating back to 1999, was caused by her type III acromion and degenerative arthritis in her acromioclavicular joint, and was not at all related to or caused by her work during the shut-down.
 {¶ 26} Upon thoroughly reviewing the record and in accordance with the standard of review articulated above, we decline the university's request to set aside the trial court's decision as against the manifest weight of the evidence. Although there was conflicting evidence as to what caused Bales to suffer impingement syndrome in both her shoulders after May 2004, we find that there was some competent, credible evidence to support the trial court's determination that Bales suffered from impingement syndrome in both her shoulders as a result of her job duties during the May 2004 shut-down. The fact that the decision was supported by some competent, credible evidence is sufficient to prevent a reviewing court from reversing the decision of the trial court. SeeSimms v. Turner (Mar. 31, 1988), Warren App. No. CA87-10-081;Gerijo; Ford. The trial court's judgment allowing Bales to participate in the workers' compensation fund for impingement syndrome of her right and left shoulders is therefore not against the manifest weight of the evidence and is upheld. The university's *Page 11 
assignment of error is sustained in part and overruled in part.
 {¶ 27} Judgment affirmed in part, reversed in part, and remanded for further proceedings in accordance with the law and consistent with this opinion.
 BRESSLER and POWELL, JJ., concur. *Page 1