HOME HELPERS/DIRECT LINK, Appellee,

v.

ST. PIERRE, Appellant.

[Cite as *Home Helpers/Direct Link v. St. Pierre*, 196 Ohio App.3d 480, 2011-Ohio-4909.]

Court of Appeals of Ohio,
Twelfth District, Warren County.

No. CA2010–11–116.

Decided Sept. 26, 2011.

482

Craig T. Matthews & Associates, L.P.A., Craig T. Matthews, and J. Conrad Dillon, for appellee.

H. Charles Wagner, for appellant.

PIPER, Judge.

{¶ 1} Defendant-appellant, John St. Pierre, appeals the decision of the Warren County Court of Common Pleas awarding judgment in favor of plaintiff-appellee, Home Helpers/Direct Link ("Home Helpers").

{¶ 2} St. Pierre married his wife, Barbara Janice St. Pierre, in 1966, and the two later had a son, Jason, and a daughter, Jodi. After approximately 30 years of marriage, Barbara was diagnosed with multiple sclerosis, and in the last years of her life she could not care for herself. Barbara was bedridden and required St. Pierre's help in accessing her wheel chair, dressing, bathing, changing her incontinence pads and catheters, and doing household chores such as cooking and cleaning. In December 2007, Barbara broke her hip when she fell off a wheelchair ramp and underwent surgery. After she was released from the hospital, she was transferred to a skilled nursing facility where she resided for approximately one month. During that time, St. Pierre moved out of the marital home into his own apartment and within a few months began an intimate relationship with another woman.

{¶ 3} On January 7, 2008, Barbara hired Home Helpers to provide her with 24–hour, in-home care for all the services St. Pierre used to help her with. Home Helpers sent the invoices to St. Pierre, and for six months, he paid the bills. However, in June 2008, St. Pierre stopped paying the invoices. In December

2008, St. Pierre filed a complaint for legal separation, and Barbara contested it. Barbara died before divorce proceedings were finalized.

{¶ 4} Despite St. Pierre's nonpayment of the invoices, Home Helpers continued to provide Barbara with around-the-clock care and did so until she was hospitalized in January 2009. Once in the hospital, Barbara never returned home, and she died in April 2009 during another stay in a nursing facility. From the time St. Pierre stopped paying the bills, until the last day Home Helpers provided care, Home Helpers provided $37,780 in services to Barbara.

{¶ 5} Home Helpers brought suit to recover the unpaid balance, and the trial court held a bench trial during which it heard testimony from the owner of Home Helpers and St. Pierre, as well as a home-care provider who testified to the value of the services offered by Home Helpers. The trial court found in favor of Home Helpers and granted judgment in the amount of $37,780 plus interest and costs. St. Pierre now appeals the trial court's decision, raising the following assignments of error. For ease of discussion, and because they are interrelated, we will discuss St. Pierre's first and third assignments of error together.

Assignment of Error No. 1

Appellee's failure to establish each element of the prima facie [sic] required for recovery of debt under R.C. § 3101.03(C)[1] is fatal to the claim and precludes the imposition of liability on Mr. St. Pierre.

Assignment of Error No. 3

The trial court erred in finding that Mr. St. Pierre abandoned decedent without cause and was, consequently, liable for the debt owed to appellee.

{¶ 6} St. Pierre argues in his first and third assignments of error that the trial court erred in finding that he was required to pay Home Helpers' fee.

{¶ 7} An appellate court will not reverse a judgment as being against the manifest weight of the evidence when the judgment is supported by some competent, credible evidence going to all essential elements of the claim involved. *1st Natl. Bank v. Mountain Agency, L.L.C.*, Clermont App. No. CA2008–05–056, 2009-Ohio-2202, 2009 WL 1278429, ¶ 13, citing *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 376 N.E.2d 578, syllabus. In determining whether a judgment is against the manifest weight of the evidence, an appellate court must be "guided by a presumption that the findings of the trier-of-fact were indeed correct." *Seasons Coal Co. v. Cleveland* (1984), 10 Ohio St.3d 77, 80, 461

---

1. Throughout his brief, St. Pierre refers to the applicable statute regarding a married person's obligation to support his spouse as R.C. 3101.03(C). The correct citation and applicable statute is R.C. 3103.03(C). For ease of discussion, we will refer to the proper statutory citation rather than using "sic" to identify that the quoted passage appears exactly as in St. Pierre's brief.

N.E.2d 1273. Because the trial court is in the best position to weigh the testimony and observe the witnesses' demeanor in order to gauge their credibility, this court must not substitute its judgment for that of the trial court when there is competent and credible evidence supporting the trial court's findings of fact and conclusions of law. Id.

{¶ 8} " 'Where the decision in a case turns upon credibility of testimony, and where there exists competent and credible evidence supporting the findings and conclusions of the trial court, deference to such findings and conclusions must be given by the reviewing court.' " *Choate v. Tranet, Inc.,* Warren App. No. CA2005–09–105, 2006-Ohio-4565, 2006 WL 2535770, ¶ 69, quoting *Myers v. Garson* (1993), 66 Ohio St.3d 610, 614, 614 N.E.2d 742. Accordingly, "[i]n reviewing a bench trial, an appellate court will uphold the trial court's decision unless it appears the record cannot support a reasonable person in concluding as the trial judge did." *Bales v. Miami Univ.,* Butler App. No. CA2006–11–295, 2007-Ohio-6032, 2007 WL 3348270, ¶ 16.

{¶ 9} According to R.C. 3103.03, "(A) Each married person must support the person's self and spouse out of the person's property or by the person's labor. If a married person is unable to do so, the spouse of the married person must assist in the support so far as the spouse is able. * * * (C) If a married person neglects to support the person's spouse in accordance with this section, any other person, in good faith, may supply the spouse with necessaries for the support of the spouse and recover the reasonable value of the necessaries supplied from the married person who neglected to support the spouse unless the spouse abandons that person without cause."

{¶ 10} During the bench trial, St. Pierre essentially argued that the requirements of R.C. 3103.03(C) were not met because Barbara did not need around-the-clock care, she was able to pay Home Helpers on her own, and Barbara had abandoned him prior to the time that she hired Home Helpers.

{¶ 11} Regarding Barbara's needs, "[t]he term, 'necessaries,' as used in the statute means such food, medicines, clothing, shelter, or personal services as are usually considered reasonably essential for the preservation and enjoyment of life." *Smith v. Sutter* (1951), 90 Ohio App. 320, 322–323, 106 N.E.2d 658. St. Pierre challenges the trial court's ruling that Barbara's necessaries included 24–hour care from Home Helpers.

{¶ 12} St. Pierre testified that Barbara was able to eat on her own, that she required only an hour of assistance in the morning and another hour at night, and that Barbara required little help with food preparation because she was a vegetarian who ate mostly salads and frozen meals. St. Pierre also testified that Barbara required little help getting dressed because she wore a wig and wore

dresses that were split down the back so that Barbara could put her arms through the dress and tuck the remainder between her back and the wheelchair. However, the court heard other evidence that directly contradicted St. Pierre's testimony.

{¶ 13} Thom Gastineau, Home Helpers' owner, testified that when he first met with Barbara, he observed that she was bedridden and needed assistance with personal hygiene, preparing meals, using the restroom, taking her medication, and dressing and undressing. Barbra also needed assistance moving to and from her wheelchair and bed with a Hoyer lift system, which required operation by another person. Gastineau testified that due to Barbara's multiple sclerosis, she had "extremely limited" use of her hands and was unable to stand on her own without assistance.

{¶ 14} According to Barbara's medical records, she was unable to bear any weight, stand, pivot, brace herself, or pull herself up. She also suffered from other conditions such as diabetes, depression, and incontinence.

{¶ 15} Although there was competing testimony regarding the level of care Barbara required, the trial court was in the best position to judge the credibility of the two witnesses regarding how Barbara functioned and to what degree she required assistance. The record also contains Barbara's medical records, which detail her physical limitations and other ailments. These medical records provide competent and credible evidence to support the trial court's finding that Barbara did require constant care and that Home Helpers provided personal services reasonably essential for the preservation and enjoyment of her life. The trial court's decision regarding Barbara's needs was not against the manifest weight of the evidence.

{¶ 16} The trial court also found that St. Pierre was required to pay the reasonable value of the necessaries supplied by Home Helpers because according to R.C. 3103.03(A), if a married person is unable to support himself, "the spouse of the married person must assist in the support so far as the spouse is able." We agree with St. Pierre that the plain language of R.C. 3103.03(A) requires that the married person be *unable* to support himself before the spouse of the married person must assist. See *Edwin Shaw Hosp. v. Mulloy* (May 10, 1995), Summit App. No. 16723, 1995 WL 283784.

{¶ 17} We first note that R.C. 3103.03(C) does not in any way limit the surviving spouse's obligation to reimburse a third party for necessaries provided to the deceased spouse during his or her life. We note this fact because there are two separate time frames germane to the case at bar; the time Barbara was alive and receiving Home Helpers' care and the time the cause of action arose once Barbara died. The trial court's decision does not clearly indicate which time

frame it considered more relevant in resolving the cause of action. However, we find that under either time frame, Barbara was unable to pay for Home Helpers' care herself.

{¶ 18} During Barbara's life, she relied solely on St. Pierre and his income to sustain the marital home and the family's needs. St. Pierre testified that even after he moved out of the marital home, he continued to pay Barbara's "normal living expenses" until she died. According to St. Pierre, these normal living expenses included homeowner's insurance, car insurance, taxes, electricity, water, oil, cable, Internet, phone, and cell phone, as well as a van modified for wheelchair accessibility. St. Pierre also testified that he gave Barbara $120 a week for food and "whatever else."

{¶ 19} We also note that St. Pierre paid Home Helpers for approximately the first six months that Barbara received its assistance. St. Pierre also gave Barbara a $20,000 check in anticipation of a divorce settlement. The record indicates that Barbara signed the check over to Home Helpers, who applied the funds to outstanding invoices. However, after the $20,000 was exhausted in June 2008, Barbara continued to receive care from Home Helpers and was unable to pay the bill on her own.

{¶ 20} The record does not contain any evidence to refute the fact that Barbara relied solely on St. Pierre for her support or any evidence that Barbara had the means to pay Home Helpers' invoice on her own. Instead, St. Pierre claims that he has not neglected to pay for Barbara's necessaries because (1) he never entered into the contract for Home Helpers' services, (2) he was unaware that Barbara needed constant care, and (3) Home Helpers should have sought payment from Barbara before her death.

{¶ 21} However, the Ohio Supreme Court has rejected similar arguments and has specifically found that a married person must support a spouse when that spouse is unable to provide for his or her own support, regardless of the fact that the married person did not personally contract for the services and did not pledge his own credit or otherwise refuse to obtain the needed services or necessaries for the spouse. *Ohio State Univ. Hosp. v. Kinkaid* (1990), 48 Ohio St.3d 78, 549 N.E.2d 517.

{¶ 22} Regardless of the fact that St. Pierre did not sign the contract, the evidence is clear that Barbara relied on St. Pierre for her support, especially in the final years of her life once her multiple sclerosis intensified and she became bedridden. Had Home Helpers brought suit during Barbara's life, R.C. 3103.03 would still be controlling, and St. Pierre would have been obligated to reimburse Home Helpers for the necessaries it provided Barbara.

{¶ 23} In the alternative, R.C. 3103.03(C) mandates that St. Pierre reimburse Home Helpers after Barbara's death for the services it provided during her life. In the *Kinkaid* case mentioned above, the hospital brought an action against the surviving spouse for payment of medical services rendered to her husband before his death. 48 Ohio St.3d 78, 549 N.E.2d 517. The court found that the wife was obligated to pay the hospital, provided she was able, because her husband's assets at the time of his death were insufficient to pay the medical expenses.

{¶ 24} The record indicates that Barbara was unable to pay for Home Helpers before her death as well as upon her passing. Regarding any estate that Barbara had, St. Pierre testified that the marital home was worth approximately $140,000 and the record indicates that the home was paid off in full as of the date of Barbara's death and was not in any way encumbered by a mortgage. The trial court found, and we agree, that if St. Pierre and Barbara had divorced before her death she would have been entitled to a portion of the equity in the home as well as a division of other marital property and assets. However, because Barbara died before the divorce was finalized, St. Pierre took sole possession of the marital property because the parties owned the home as joint tenants with right of survivorship. Upon Barbara's death, the home and its equity passed fully to St. Pierre. Had the divorce occurred before Barbara's death and the parties divided the martial assets, we might have agreed with St. Pierre that Barbara or her estate could have paid Home Helpers' bill. However, the equities and marital estate were not divided, and St. Pierre now has the full financial benefit of the marital home. Barbara was unable to support herself until her death, and the trial court's findings regarding Barbara's inability to pay are supported by competent and credible evidence.

{¶ 25} St. Pierre relies heavily on the final section of R.C. 3103.03(C), which relieves a married party from supporting a spouse when that spouse abandons the married person without cause. St. Pierre claims that Barbara abandoned him by being cruel to him, verbally and physically assaulting him, running over his feet with her wheelchair, and throwing household objects at him during arguments. St. Pierre also argues that Barbara called him unpleasant names and told St. Pierre to move out of the marital home.

{¶ 26} Few cases exist in Ohio in which a party denies liability under R.C. 3103.03(C) for having been abandoned by a spouse. Even then, courts have not established a definition of abandonment within the context of the statute. St. Pierre cites several cases in which the spouses were abusive, neglectful, or cruel to their spouse, and refers to cases where marriages are marked by "daily bickering" and "nagging." However, these cases are specific to divorce actions providing grounds for divorce and do not discuss abandonment as it relates to R.C. 3103.03(C).

{¶ 27} In the absence of any precedent for what entails abandonment under the statute, we are guided by the word's common meaning as is found in Black's Law Dictionary (9th Ed. 2009). Abandonment is "the act of leaving a spouse or child willfully and without an intent to return." This definition comports with findings of abandonment in the few cases in which an individual was not required to support a spouse under R.C. 3103.03(C) because of abandonment. In *Edwin Shaw Hosp. v. Mulloy* (May 10, 1995), Summit App. No. 16723, 1995 WL 283784, the wife was sued by a hospital for medical services provided to her husband, who had moved out of the home several months before accepting the medical services. The court found that because the husband had moved out of the marital home without any reason, he had abandoned his wife without cause, and the wife was not liable under the statute to pay for his medical services. In *Wolf v. Friedman* (1969), 20 Ohio St.2d 49, 53, 253 N.E.2d 761, the Ohio Supreme Court noted that a wife had abandoned her husband with good cause when she moved out of the martial home because her husband performed "illegal acts upon her body."

{¶ 28} The record is clear that Barbara did not abandon St. Pierre throughout the course of their marriage. Beyond the fact that Barbara never moved out of the marital home (other than temporary stays in nursing facilities due to medical necessity), she also contested St. Pierre's complaint for legal separation. Simply stated, Barbara never committed the act of leaving St. Pierre willfully and without an intent to return to the marital relationship or home.

{¶ 29} Regarding the marriage, Barbara filed an answer to St. Pierre's complaint for separation and specifically denied any cruelty or neglect of duty to him. Because of her death, her answer is the only evidence to refute St. Pierre's claims regarding an unhappy marriage. However, even if we were to accept as fact that Barbara called St. Pierre names, threw things at him, or ran over his foot with her wheelchair, we would not find that these acts rise to the level of abandonment within the meaning of R.C. 3103.03(C).

{¶ 30} It seems that St. Pierre is suggesting that *he* had good reason to abandon Barbara based on what he deemed an intolerable and "horrible" marriage. However, the standard set forth in R.C. 3103.03(C) requires that the spouse on whose behalf the necessaries were provided abandons the other party without cause. Therefore, St. Pierre's justifications for not providing for Barbara's necessaries are unpersuasive. We agree with the trial court's finding that "while it may well have been difficult living in this marital relationship with a person who was severely handicapped and suffering from depression, there is simply no credible evidence that [Barbara] physically abandoned [St. Pierre]." The trial court's ruling is supported by competent, credible evidence.

{¶ 31} The trial court's ruling that St. Pierre must pay Home Helpers based on his duty under R.C. 3103.03(C) to support Barbara was not against the manifest

weight of the evidence. After reviewing the record, we find that the trial court's reasoning was supported by competent, credible evidence going to all essential elements of the case. St. Pierre's first and third assignments of error are therefore overruled.

### Assignment of Error No. 2

{¶ 32} "Appellee lacked the requisite expectation of payment from Mr. St. Pierre at the time the contract for services was executed, thus rendering Mr. St. Pierre not liable under R.C. § 3101.03(c)."

{¶ 33} In St. Pierre's second assignment of error, he asserts that the trial court erred in awarding judgment to Home Helpers because Home Helpers could not expect him to pay for the services provided to Barbara.

{¶ 34} St. Pierre cites *Tille v. Finley* (1933), 126 Ohio St. 578, 186 N.E. 448, for the proposition that a married person's duty to support a spouse is not unconditional. We note first that the *Tille* court did not analyze R.C. 3103.03, but instead noted the changing gender roles emerging in 1933. "In years gone by, the courts of this and other states were inclined to hold that the marriage relation created an unconditional liability on the part of the husband for necessaries furnished the wife, and at that time there was strong reason why the the [sic] courts should so hold. In those days the wife was mother, matron, and maid. She was likewise shackled to her husband by the common law. If she performed the duties required of her in her triune capacity, she had no independent earning power, and her right to her keep was absolute. The law did not go beyond the obligation imposed by the marriage contract in fixing the liability, and the duty of the husband to furnish the wife with the necessaries of life was none the less absolute. As women gradually entered man's former sphere, the law in its wisdom relaxed its requirements so far as the man and husband was concerned. It shifted some of the responsibility from his shoulders to the shoulders of the woman and wife." Id. at 579.

{¶ 35} The *Tille* court then considered the evidence presented to the lower court and found that the creditor had furnished medical services to the wife at her solicitation, extended credit to the wife, and looked to the wife alone for his pay.

{¶ 36} However, and as we have discussed before, the Ohio Supreme Court has since released *Ohio State Univ. Hosp. v. Kinkaid* (1990), 48 Ohio St.3d 78, 549 N.E.2d 517, in which it specifically distinguished the facts from *Tille*. In *Kinkaid,* the court stated, "*Tille* is easily distinguished on the basis of the court's holding therein. The court found that the creditor-plaintiff had furnished the medical services to the wife at her solicitation, had extended credit to the wife, and had looked to the wife alone for payment. In addition, * * * the wife was

still alive and could have been pursued for collection." Id. at 79. After distinguishing *Tille,* the *Kinkaid* court disregarded the spouse's argument that she was not liable for her husband's medical bills when she had not personally contracted for the services, had not pledged her own credit, and had not refused to obtain the needed services for her husband.

{¶ 37} The facts of the case at bar are similar to those in *Kinkaid* and distinguishable from *Tille.*[2] The plain language of R.C. 3103.03 does not require a married person to enter into a contract before his duty to support arises. Moreover, Home Helpers not only looked to St. Pierre for payment, but also accepted payment from him for the first six months of its service. We are little persuaded by *Tille* and its application to the current version of R.C. 3103.03 and instead are guided by the precedent set forth in *Kinkaid* regarding the Ohio Supreme Court's explanation as to the effects of R.C. 3103.03.

{¶ 38} St. Pierre's second assignment of error sets forth arguments under contract law that are inapplicable to the statutory claim brought by Home Helpers under R.C. 3103.03(C). St. Pierre's second assignment of error is therefore overruled.

Judgment affirmed.

HENDRICKSON, P.J., and HUTZEL, J., concur.

---

2. St. Pierre relies on *Riverside Methodist Hosp. v. Payne* (1988), 48 Ohio App.3d 123, 548 N.E.2d 987, for the proposition that a wife is not liable for the medical expenses of her deceased husband when she does not share contractual privity with the medical provider. However, *Payne* was also decided before *Kinkaid,* and the *Payne* court did not have the benefit of the *Kinkaid* court's pronouncement that a contractual agreement need not exist in order to establish liability under R.C. 3103.03(C).